IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARY ANN C.,  )
 )
       Plaintiff,  )
 )
vs. ) Case No. 17-cv-00769-JPG-CJP
 )
COMMISSIONER OF SOCIAL SECURITY, )
 )
       Defendant. )
 )

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Mary Ann C. seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff applied for DIB and SSI on April 26, 2013, alleging a disability onset date of July 30, 2004. (Tr. 203-12.) The Agency denied her application at the initial level and again upon reconsideration. (Tr. 86, 101, 118, 135.) Plaintiff requested an evidentiary hearing, which Administrative Law Judge (ALJ) Kevin Martin conducted in January 2016. (Tr. 42-69.) ALJ Martin issued an unfavorable decision thereafter. (Tr. 20-35.) The Appeals Council denied plaintiff's request for review and the ALJ's decision became the final agency decision. (Tr. 1-3.) Plaintiff exhausted her administrative remedies and filed a timely Complaint in this Court. (Doc. 1.)

### Plaintiff's Argument

Plaintiff contends the ALJ erroneously assessed her treating source's opinion and relied on inadequate vocational expert testimony.

1

## Legal Standards

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.[1]

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but the impairment is neither listed in nor equivalent to the impairments in the regulations— failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant

---

[1] The legal standards for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) are largely the same. The above paragraph in this order cites the relevant statutory provisions for DIB, while the SSI provisions are located at 42 U.S.C. §§ 1382c(a)(3)(A), 1382c(a)(3)(D), and 20 C.F.R. § 416.972. Most citations herein are to the DIB regulations out of convenience, but also apply to SSI challenges.

is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id.*; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## **The ALJ's Decision**

ALJ Martin determined that plaintiff met the insured status requirements through March 30, 2008 and had not engaged in substantial gainful activity since July 30, 2004, the alleged onset date. The ALJ opined plaintiff had severe impairments of degenerative disc disease (DDD) of the cervical spine; DDD of the lumbar spine; carpel tunnel syndrome; status post right foot tendon repair; obesity; major depressive disorder with anxious distress; and adjustment disorder with mixed anxiety and depressed mood. (Tr. 22.) ALJ Martin concluded that plaintiff

had the RFC to perform light work with several limitations. (Tr. 25.) Although plaintiff was unable to perform any past relevant work, she could perform other jobs that existed in the national economy. Thus, the ALJ found plaintiff not disabled. (Tr. 33-35.)

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

### 1. Agency Forms

Plaintiff indicated that depression, right- and left-hand carpal tunnel syndrome, right ankle problems, anxiety, and lower back pain prevented her from maintaining employment. (Tr. 228.) Plaintiff cared for her two daughters and their dogs. Her children and mother helped her take care of the animals. Depression and pain interfered with plaintiff's sleep. (Tr. 287.) She could prepare frozen dinners and sandwiches, clean, do laundry, and complete household repairs with her daughters' assistance. She went grocery shopping on a weekly or bi-weekly basis. Plaintiff had difficulty paying bills because she got "side tracked." (Tr. 288-90.)

Plaintiff could walk for about thirty to forty-five minutes before she needed to rest. When her ankle bothered her, plaintiff used a brace. She did not handle stress or changes in routine very well and experienced shaking and panic. (Tr. 291-92.)

### 2. Medical Records

Throughout the record, plaintiff received treatment for depression; anxiety; right ankle pain; lower back pain; elbow and forearm pain; asthma; neuralgia, neuritis, and radiculitis, unspecified; myalgia and myositis, not otherwise specified (NOS); and bilateral carpal tunnel syndrome. (Tr. 344-420.) Plaintiff underwent a Kidner procedure to her right foot in 2009 (Tr.

691), was admitted to St. Joseph Memorial Hospital for a Xanax overdose in July 2012 (Tr. 482, 488-90), and had bilateral carpal tunnel release surgery in 2013 (Tr. 584-85, 587-88.) Plaintiff's arguments on review, however, center on her treatment with Dr. Dale Blaise and his assessment of plaintiff's limitations related to back pain. The summary of the medical records is geared towards those issues.

Plaintiff's first visit of record with Dr. Blaise is dated November 2, 2012. Plaintiff presented with right arm pain, anxiety, and depression. A physical examination was normal. Dr. Blaise assessed plaintiff with adjustment disorder with mixed anxiety and depressed mood; asthma; joint pain in the wrists; neuralgia, neuritis, and radiculitis, unspecified; and myalgia and myositis, NOS. He prescribed plaintiff Ibuprofen. (Tr. 551-54.)

On November 14, 2012, plaintiff presented to Physician Assistant (PA) Amanda Sailliez at Dr. Blaise's office. Plaintiff reported anxiety and irritability, for which PA Sailliez prescribed Xanax. (Tr. 548-550.)

Plaintiff followed-up with PA Sailliez on November 26, 2012. On examination, she demonstrated moderate, generalized and medial lower back tenderness. PA Sailliez assessed plaintiff with lumbago and prescribed her Medrol. (Tr. 545-47.)

On January 14, 2013, plaintiff presented to Dr. Blaise with complaints of difficulty sleeping. Dr. Blaise referred plaintiff to the Orthopaedic Institute of Southern Illinois for treatment of carpal tunnel syndrome and adjusted plaintiff's Xanax prescription. (Tr. 542-43.)

Plaintiff presented to PA Sailliez on January 22, 2013 with complaints of pain in her right ankle. (Tr. 539-40.) PA Sailliez released plaintiff to home in good condition and instructed her to follow-up if she experienced no improvement or a worsening in symptoms. (Tr. 541.)

On March 22, 2013, Dr. Emily Hanson, an osteopathic doctor in Dr. Blaise's office, gave plaintiff a sample of Pristiq for adjustment disorder. (Tr. 529-31.)

Plaintiff presented to Dr. Blaise on May 6, 2013, with complaints of moderate left wrist pain, anxiety, and irritability. Dr. Blaise prescribed Ativan for anxiety and discontinued plaintiff's Xanax. He instructed plaintiff to follow-up with her orthopedist regarding her wrist pain. (Tr. 526-28.)

On June 11, 2013, plaintiff saw Dr. Hanson and reported pain in her left hand, left wrist, and lower back. Dr. Hanson assessed plaintiff with lumbago and prescribed Clonazepam and Flexeril. (Tr. 725-26.)

Plaintiff followed up with PA Sailliez on August 20, 2013 with complaints of anxiety, fatigue, irritability, and nervousness. She also had pain in her right wrist. PA Sailliez discontinued plaintiff's Venlafaxine and started her on Clonazepam and Bupropion. (Tr. 723-24.)

Plaintiff presented to PA Sailliez on September 30, 2013 with complaints of anxiety and irritability. PA Sailliez prescribed plaintiff Buspirone and referred her to a psychiatrist. (Tr. 710-11.)

On January 7, 2014 plaintiff presented to Dr. Hanson with increased anxiety and depression. Dr. Hanson restarted plaintiff on Clonazepam and Olanzapine for anxiety. She also prescribed plaintiff Norco for carpal tunnel syndrome. (Tr. 647-48.)

An MRI of plaintiff's cervical spine from February 17, 2014 showed mild disc osteophyte complex at C3-4 with small central disc protrusion that produced mild spinal stenosis; small left paracentral disc protrusion at C5-6 that produced mild spinal stenosis; and small central disc protrusion at C6-7 that produced mild spinal stenosis. (Tr. 650-51.)

On March 4, 2014, plaintiff underwent interlaminar epidural steroid injections for DDD of the cervical spine. (Tr. 652.)

Plaintiff presented to PA Sailliez on March 6, 2014 with complaints of lower back pain and increased anxiety. Physical examination of plaintiff's lumbosacral spine was normal. (Tr, 644-45.) An x-ray revealed mild DDD of L5-S1 and mild left convex lumbar curvature. (Tr. 654.) PA Sailliez prescribed plaintiff Buspirone and Escitalopram Oxalate. (Tr. 646.)

Plaintiff followed-up with PA Sailliez on March 20, 2014. She reported appetite loss, excessive crying, and fatigue. PA Sailliez restarted plaintiff on Norco for lumbago and categorized her condition as "good." (Tr. 639-40.)

On May 5, 2014, plaintiff followed-up with Dr. Blaise and complained of increased anxiety and back pain. He assessed plaintiff with adjustment disorder with mixed anxiety and depressed mood, for which he prescribed Escitalopram and Buspirone. He also assessed plaintiff with arthralgia and lumbago and ordered an MRI of her lumbar spine. (Tr, 763-64.)

The MRI, dated May 16, 2014, showed disc desiccation at L4-L5 and L5-S1. There was mild posterior bilateral paracentral bulging of the L2-L3 disc with mild encroachment upon the ventral thecal sac and central bilateral neural foramina. The image also demonstrated mild posterior bilateral paracentral bulging of the L4-L5 disc with associated facet hypertrophy, resulting in mild spinal and mild bilateral neuro foramina stenosis. There was also moderate posterior bilateral paracentral bulging of the L5-S1 disc with associated facet hypertrophy, resulting in mild spinal and moderate bilateral neural foramina stenosis. (Tr. 761.)

On June 9, 2014, plaintiff presented to PA Sailliez for chronic lumbar back pain with associated decreased range of motion. She was treating the symptoms with nonsteroidal anti-inflammatory drugs, opioid analgesics, and muscle relaxants, with poor results. Physical

7

examination showed moderate, generalized and medial low back tenderness to palpation. PA Sailliez assessed plaintiff with degeneration of the intervertebral disc of the lumbosacral region. She referred plaintiff for pain management, prescribed Norco, adjusted plaintiff's Ibuprofen, and referred plaintiff to a specialist. (Tr. 755-56.)

On June 30, 2014, plaintiff presented to Dr. Gerson Criste at SIH Brain & Spine Institute. Plaintiff reported moderate back pain, which was aggravated by standing and walking, and relieved by pain medications and drugs. On physical examination, plaintiff was tender over the lumbosacral spine. Dr. Criste diagnosed plaintiff with chronic pain and degeneration of the lumbar or lumbosacral intervertebral. (Tr. 779-82.)

Plaintiff received L5-S1 interlaminar epidural steroid injections on July 10, 2014. (Tr. 775.)

Plaintiff saw Nurse Practitioner (NP) Lisa Arnold at SIH Brain & Spine Institute on September 24, 2014. She reported continued back pain and stated the steroid injections provided no relief. NP Arnold assessed plaintiff with low back pain and lumbar spondylosis. An MRI revealed facet arthropathy at L4-5 and L5-S1. On examination, plaintiff was neurologically intact with low back tenderness and increased pain with range of motion. Plaintiff scheduled bilateral facet joint injections and was instructed to follow-up afterwards in six weeks. (Tr. 875-77.)

Plaintiff received bilateral L4-5 and L5-S1 facet joint injections on October 21, 2014. (Tr. 885.)

Plaintiff followed up with NP Arnold on December 1, 2014. She reported the injections did not alleviate her back pain. She demonstrated lumbar spine tenderness on examination. NP Arnold assessed plaintiff with low back pain and lumbar spondylosis.

8

Plaintiff was instructed to perform physical therapy, use a TENS unit, and follow-up in two months. (Tr. 870-73.)

Plaintiff presented to Dr. Hanson on April 7, 2015 with complaints of chronic lumbar back pain and decreased range of motion. Plaintiff reported the steroid injection did not help and actually worsened the pain. Physical examination showed no tenderness to palpation; trunk extension was to 20 degrees; double straight leg lowering was 5/5; lumbar spine flexion was to 50 degrees; right rotation was to 18 degrees; and left rotation was to 18 degrees. Prone knee bending, slump, and straight leg raising tests were all negative. Dr. Hanson assessed plaintiff with lumbago and neuralgia, neuritis, and radiculitis. She continued plaintiff's Escitalopram Oxalate and prescribed Norco. (Tr. 819.)

An MRI of plaintiff's lumbar spine from April 13, 2015 demonstrated moderate to severe neural foraminal narrowing at L5/S1 on the left, which had progressed. There was moderate narrowing at L5/S1 on the right. The MRI also demonstrated disc desiccation with moderate disc height loss greeted at L5/S1, which had also progressed. (Tr. 798.)

Plaintiff saw PA Sailliez on April 16, 2015 for chronic lumbar back pain. Physical examination demonstrated moderate, localized medial low back and spinal column tenderness. PA Sailliez referred plaintiff to a neurological surgeon for the degeneration of her intervertebral disc and prescribed Diclofenac Sodium. (Tr. 817-18.)

Plaintiff followed-up with NP Arnold at SIH Brain & Spine Institute on May 5, 2015. She reported her low back pain was aggravated by bending, lifting, and prolonged standing, and relieved by pain medication. NP Arnold reviewed an MRI and opined plaintiff had multilevel DD and degenerative joint disease; bilateral foramina stenosis at L3-4; mild to moderate bilateral formainal stenosis at L4-5; and moderate right and moderate to severe left foraminal stenosis at

L5-S1. On examination, plaintiff was neurologically intact. She had undergone injections with no reported improvement. NP Arnold assessed plaintiff with degeneration of the lumbar or lumbosacral intervertebral disc, low back pain, and lumbar spondylosis. She referred plaintiff to physical therapy and issued plaintiff a TENS unit. (Tr. 864-67.)

An MRI of plaintiff's lumbar spine from May 16, 2015 showed disc desiccation at L4-L5 and L5-S1, with mild posterior bilateral paracentral bulging of the L2-L3 disc with mild encroachment upon the ventral thecal sac and central bilateral neural foramina; mild posterior bulging of the L3-L4 disc with minimal encroachment upon the ventral thecal sac; mild posterior bilateral paracentral bulging of the L4-L5 disc with associated facet hypertrophy resulting in mild spinal and mild bilateral neuro foramina stenosis; and moderate posterior bilateral paracentral bulging of the L5-S1 disc with associated facet hypertrophy, resulting in mild spinal and moderate bilateral neural foramina stenosis. (Tr. 799.)

On August 14, 2015, Dr. Hanson continued plaintiff's Norco for degeneration of the intervertebral disc and prescribed Zoloft for adjustment disorder. (Tr. 806-07.)

Plaintiff presented to PA Sailliez on October 5, 2015, with complaints of pain and decreased range of motion in her lower back. She reported poor symptom control. On physical examination, plaintiff demonstrated moderate, localized, medial lower back tenderness over her spinal column. PA Sailliez continued plaintiff's Norco and prescribed Medrol for neuralgia, neuritis, and radiculitis. (Tr. 803-04.)

Dr. Blaise completed an RFC questionnaire in May 2014. He stated plaintiff had lumbago, anxiety, and depression. Her symptoms included lower back pain, which would frequently interfere with her attention and concentration. Dr. Blaise also indicated that plaintiff's medications caused drowsiness, dizziness, and fatigue. He opined plaintiff could sit and

stand/walk for thirty minutes at a time; and sit and stand/walk for a total of three hours in an eight-hour workday. According to Dr. Blaise, plaintiff would need to take hourly-unscheduled breaks that lasted fifteen to twenty minutes each. He opined plaintiff could not work an eight-hour workday, five-days per week, on a sustained basis and her conditions would cause her to be absent from work more than four days each month. (Tr. 961-63.)

On November 3, 2015, plaintiff presented to NP Arnold and complained of back pain. Plaintiff reported she attended physical therapy, which did not provide relief. Plaintiff was also using a TENS unit. NP Arnold assessed plaintiff with spondylosis without myelopathy or radiculopathy in the lumbosacral region. Plaintiff reportedly attended only one physical therapy sessions, had three cancellations, and four no shows. NP Arnold told plaintiff there was nothing further they could do for her back pain. (Tr. 855-58.)

### 3. State Agency RFC Assessments

Dr. B. Rock Oh conducted an RFC assessment on October 18, 2013. He opined plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; and frequently climb ladders, ropes, and scaffolds, and crawl. Plaintiff should also avoid concentrated exposure to hazards. (Tr. 81-83.) Dr. Lenore Gonzalez completed an RFC assessment on May 14, 2014, and concurred with Dr. Oh's assessment. (Tr. 113-15.)

### 4. Evidentiary Hearing

ALJ Martin conducted an evidentiary hearing on January 28, 2016, at which plaintiff was represented by counsel. Plaintiff testified that she lived in a home with her eleven and nine-year old children. She had a driver's license. (Tr. 49.) Plaintiff's back pain made it difficult for her to sweep and vacuum. (Tr. 55.) She experienced back pain she rated at a seven out of ten, which

11

worsened with activity or standing. She used a TENS unit and took hydrocodone. She received injections in the past, which did not alleviate her pain, and underwent physical therapy, which exacerbated her pain.

On a typical day, plaintiff woke up around six a.m. and got her kids ready for school. She cooked, mopped, swept, and vacuumed as much as she could tolerate with the pain. Her children helped her do laundry and wash dishes. Plaintiff grocery shopped but she had friends help her carry the bags. She checked on her mother once a week. Plaintiff could sit for about twenty minutes and often laid down throughout the day due to fatigue. (Tr. 56-59.) She had difficulty lifting items, buttoning shirts, and picking up small change because of numbness in her hands. (Tr. 61.)

## **Analysis**

Plaintiff argues the ALJ improperly weighed the opinions of her treating physician, Dr. Blaise. The Social Security Regulations require an ALJ to afford controlling weight to a treating source's opinion, so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527. Otherwise, the ALJ must identify "good reasons" for rejecting the opinion and assess it against the following factors: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; and (5) the physician's specialization. *Id.*

Dr. Blaise opined plaintiff had limitations that ultimately rendered her unemployable. (Tr. 961-62.) ALJ Martin assigned the opinion "little weight" because it is:

> wholly inconsistent with the medical record evidence. The objective record does not support the extreme degree of limitations assessed. The claimant cares for four dogs, drives a car, performs housework, and does arts and crafts with her daughter. Physical examinations are relatively benign, and diagnostic findings are

12

> mostly mild in nature. There is not support in the record for finding that the claimant is unable to sit longer than thirty minutes at a time or stand/walk longer than twenty minutes at a time, nor is there evidence that she would require unscheduled breaks or have more than four absences per month.

(Tr. 32.)

This analysis erroneously strays from the Regulations' specific method for evaluating treating source opinions. As set forth above, that method consists of two "separate and distinct steps." *Williams v. Berryhill*, 2018 WL 264201, at *3 (N.D. Ill. Jan. 2, 2018). The ALJ must first determine whether the source's opinion is entitled to controlling weight in consideration of supportability and consistency with the record. If the ALJ finds the opinion is lacking in either of these aspects, the ALJ must proceed to step two, where he applies the checklist of factors articulated in 20 C.F.R. § 404.1527. The ALJ uses these factors to determine exactly what weight to assign to the opinion.

The ALJ, here, did not mention Dr. Blaise's status as a treating physician, let alone make the threshold determination that the opinion was not entitled to controlling weight . Instead, the ALJ conflated the two steps and assigned Dr. Blaise's opinion "little weight" without any explicit or implicit consideration of the regulatory factors; many of which weighed in favor of affording more weight to Dr. Blaise's opinion. For instance, Dr. Blaise treated plaintiff for roughly one and a half years before rendering his opinion, either Dr. Blaise or another treatment provider in his office saw plaintiff on nearly twenty occasions, and Dr. Blaise utilized MRIs and physical examinations to reach his conclusions.

The ALJ's decision must be sufficiently clear for the reviewing court to determine why the ALJ assigned the opinion the weight he did. Because ALJ Martin improperly condensed his analysis, the Court cannot determine whether substantial evidence supports his decision. Where

the ALJ's decision is "so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

On remand, the ALJ should clearly apply the two-step process for weighing a treating source opinion. Moreover, the ALJ should not put undue weight on plaintiff's activities of daily living. *See Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008). The ALJ discredited Dr. Blaise's opinion, in part, because it was inconsistent with plaintiff's ability to care for her dogs and children, drive a car, and perform housework. A review of the record, however, indicates plaintiff reported considerable difficulty with completing these tasks due to pain and received assistance from her friends and family.

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED: JUNE 1, 2018**

                                            **s/ *J. Phil Gilbert***
                                            **J. PHIL GILBERT**
                                            **DISTRICT JUDGE**